IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CRITTENDEN BERRY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:21-CV-0433-D |
| VS. | § | |
| | § | |
| DRIVE CASA, LLC, et al., | § | |
| | § | |
| Defendants. | § | |

<u>MEMORANDUM OPINION</u>

Plaintiff Crittenden Berry ("Berry") sues defendants Drive Casa, LLC ("Drive Casa"), Mark Gallas ("Gallas"), and Justin Cox ("Cox"), seeking to recover unpaid overtime pay pursuant to the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 *et seq.*[1] Defendants rely on the administrative exemption affirmative defense to avoid liability. Following a bench trial, and for the reasons that follow, the court finds that defendants proved that Berry was an exempt employee and therefore not entitled to recover overtime compensation under the FLSA.[2]

I

Defendant Drive Casa owns and operates subprime auto finance dealerships in the Dallas/Fort Worth area and Waco, Texas. Drive Casa was founded by Streeter Berry,

---

[1]Berry also alleged a retaliation claim, but the court dismissed that claim on December 8, 2021 in response to Berry's unopposed motion.

[2]The court sets out in this memorandum opinion its findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a)(1).

Berry's brother.  Defendant Gallas is Drive Casa's Chief Executive Officer, and defendant Cox is a part owner of the company.  In 2019 Drive Casa hired Berry to work in its Finance Department under its Chief Financial Officer, Ryan Simbeck ("Simbeck").  In this position, Berry was paid an hourly wage and received overtime pay for hours he worked in excess of 40 per week.

On October 1, 2019 defendant Gallas promoted Berry to the position of Information Technology ("IT") Director, a new position at Drive Casa, a relatively new and growing company whose IT functions had previously been largely outsourced.  As IT Director, Berry was paid an annual salary of $75,000 and was not paid overtime for work hours that exceeded 40 per week.[3]  Berry maintains in this suit that he should have been paid overtime from the time he was made IT Director until the date his employment was terminated on January 5, 2021.  Defendants raise as an affirmative defense that Berry was an exempt employee under the administrative exemption and therefore not entitled to overtime pay.[4]

II

A

The FLSA requires employers to pay overtime compensation to employees who work

_____

[3]Berry also received executive healthcare plan benefits for which hourly employees were not eligible.

[4]Defendants originally relied as well on the computer specialist exemption in 29 U.S.C. § 213(a)(17), but the court granted summary judgment in Berry's favor on this exemption.  *Berry v. Drive Casa, LLC*, 2022 WL 605302, at *8-9 (N.D. Tex. Mar. 1, 2022) (Fitzwater, J.).

more than 40 hours a week. 29 U.S.C. § 207(a)(1). "Exempt from the FLSA, however, are individuals 'employed in a bona fide executive, administrative, or professional capacity.'" *Fraser v. Patrick O'Connor & Assocs.*, 954 F.3d 742, 745 (5th Cir. 2020) (quoting 29 U.S.C. § 213(a)(1)). "[T]he ultimate decision whether [an] employee is exempt from the FLSA's overtime compensation provisions is a question of law." *Lott v. Howard Wilson Chrysler-Plymouth, Inc*., 203 F.3d 326, 331 (5th Cir. 2000) (alterations in original). "With respect to the underlying facts, the employer has the burden of establishing that an exemption applies by a preponderance of the evidence." *Fraser*, 954 F.3d at 745 (citing *Meza v. Intelligent Mex. Mktg., Inc*., 720 F.3d 577, 581 (5th Cir. 2013)). In deciding whether an exemption applies, the court "must give FLSA exemptions a 'fair reading' rather than narrowly construing them against the employer." *Faludi v. U.S. Shale Sols., L.L.C.*, 950 F.3d 269, 273 (5th Cir. 2020) (quoting *Encino Motorcars, LLC v. Navarro*, ___U.S.___, 138 S. Ct. 1134, 1142 (2018)).

To establish that the FLSA administrative exemption applies, defendants must prove three requirements by a preponderance of the evidence: (1) the employee must be "[c]ompensated on a salary or fee basis . . . at a rate of not less than $684 per week," (2) the employee's "primary duty" must be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and (3) the employee's "primary duty" must "include[] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a); *see also Dewan v. M-I, L.L.C.*, 858 F.3d 331, 334 (5th Cir. 2017)). A preponderance of the

evidence means such evidence as, when considered and compared with that opposed to it, has more convincing force and produces in the mind of the trier of fact a belief that what is sought to be proved is more likely true than not true.  To establish an affirmative defense by a "preponderance of the evidence" means to prove that the defense is more likely so than not so.  Defendants have the burden of proving each of the three required elements of their affirmative defense by a preponderance of the evidence.

B

It is undisputed that Drive Casa paid Berry more than $684.00 per week. Accordingly, the focus of the court's decision is on whether defendants have proved that Berry's "primary duty" was the performance of office or non-manual work directly related to the management or general business operations of Drive Casa or Drive Casa customers, and whether defendants have proved that Berry's "primary duty" included the exercise of discretion and independent judgment with respect to matters of significance.

The second element of the administrative exemption affirmative defense requires the employer to establish that the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers."  29 C.F.R. § 541.200(a)(2).  The regulations define an employee's "primary duty" as the "principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  "The 'directly related' test is met by the employee's 'assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or

- 4 -

service establishment.'" *Dewan*, 858 F.3d at 335 (quoting 29 C.F.R. § 541.201(a)).  For the

"directly related" inquiry, "it is 'the type of work performed by the employee' on which [the

court] must focus." *Id.* (quoting 29 C.F.R. § 541.201(a)).  "As a general rule, an employee's

'primary duty' involves over 50% of the employee's work time.  And yet, flexibility is

appropriate when applying this rule, depending on the importance of the managerial duties

as compared with other duties, frequency of exercise of discretionary power, freedom from

supervision, and comparative wages." *Lott*, 203 F.3d at 331 (citing *Smith v. City of Jackson*,

954 F.2d 296, 299 (5th Cir.1992)).

The third element requires that the employer establish that the employee's "primary

duty includes the exercise of discretion and independent judgment with respect to matters of

significance."  29 C.F.R. § 541.200(a)(3).

> In general, the exercise of discretion and independent judgment
> involves the comparison and the evaluation of possible courses
> of conduct, and acting or making a decision after the various
> possibilities have been considered. The term "matters of
> significance" refers to the level of importance or consequence
> of the work performed.

29 C.F.R. § 541.202(a); *see also Hobbs v. EVO Inc.*, 7 F.4th 241, 250 (5th Cir. 2021).  The

exercise of discretion must involve more "than the use of skill in applying well-established

techniques, procedures or specific standards described in manuals or other sources." *Jones*

*v. New Orleans Reg'l Physician Hosp. Org.*, 981 F.3d 428, 435 (5th Cir. 2020) (quoting 29

C.F.R. § 541.202(e)).  But an employee "need not exercise final decision-making authority

to fulfill the regulation's standard." *Id.* (citing *Lott*, 203 F.3d at 331); *see also* 29 C.F.R. §

541.202(c) ("employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level.").

Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b).

III

The court finds that defendants established each of the three requirements of the FLSA administrative exemption by a preponderance of the evidence: that is, they proved that (1) Berry was compensated on a salary basis at a rate of not less than $684.00 per week; that (2) Berry's primary duty was the performance of office or non-manual work directly related to the management or general business operations of Drive Casa or its customers; and (3) that

Berry's primary duty included the exercise of discretion and independent judgment with respect to matters of significance.  The evidence that supports the court's findings includes the following:[5]

●Berry had a successful tenure working for Simbeck on key projects, and his aptitude for IT was clear to Drive Casa management.  Berry told Gallas that he had single-handedly built a very successful E-commerce IT platform for his prior company, leveraging software, technology, et cetera, and that he had a good understanding of technology, which led Gallas to replace Drive Casa's third-party IT vendor, appoint Berry as the IT Director, and bring the IT function in-house.

●When Berry was promoted to the position of IT Director, he became a member of the Executive Team, which consisted of Drive Casa's top executives: Gallas (its Chief Executive Officer), Simbeck (its Chief Financial Officer), Berry (its IT Director), and Rafael Torres ("Torres") (its Chief Operating Officer).  As a member of the Executive Team, Berry provided IT-related input on the decisions made by Drive Casa's top management and attended Executive Team meetings.  Drive Casa operations relied heavily on IT.

●Berry replaced Roland, Inc. ("Roland"), which had provided third-party

---

[5]Although the court has carefully considered the trial testimony and exhibits, this memorandum opinion has been written to comply with the level of detail required in this circuit for findings of fact and conclusions of law.  *See, e.g.*, *Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (discussing standards).  The court has not set out its findings and conclusions in punctilious detail, slavishly traced the claims issue by issue and witness by witness, or indulged in exegetics, parsing or declaiming every fact and each nuance and hypothesis.  It has instead written a memorandum opinion that contains findings and conclusions that provide a clear understanding of the basis for the court's decision.

administration and third-party help desk services to Drive Casa.  Drive Casa terminated its relationship with Roland after Berry identified areas in which Roland had breached its contract (such as failing to update software and firewalls).  Berry oversaw the actual separation from Roland, which took a couple of months, and worked on implementing the transition from Roland to in-house IT.

●The telephone system was one of the most vital pieces (financially and operationally) of Drive Casa's organization.  Berry identified and vetted Vonage as the phone system in place of Weave; negotiated a price reduction from Vonage; and facilitated implementation of the Vonage system, such as through queues, phone trees, prompts, and recordings.  He was the administrator of, and managed and maintained, the Vonage account and was responsible for the phone system from an IT perspective.  In the strategy part of Berry's role as IT Director, he also investigated and vetted additional functionality of Vonage.

●Berry was intimately involved in the initial front end, implementation, and transition to Salesforce, a customer management database tool used by Drive Casa.

●Berry identified the need for, vetted, and signed the Momentum contract on Drive Casa's behalf.  He was responsible as IT Director for identifying the issues, finding a solution, vetting multiple providers, making a recommendation to Drive Casa, and overseeing implementation.

●Berry was involved from an IT perspective in the PayNearMe integration, which automated payment processing.

●Using Momentum as a provider, Berry solved a problem with Internet speed and bandwidth that was causing SecureClose not to work at the company's Northwest Highway location. SecureClose was an automated loan closing software that was a very important part of Drive Casa's business. Berry signed the Momentum contract using the title "Chief Information Officer." D. Ex. 66. He was also responsible for implementing SecureClose.

●At Gallas' request, Berry provided his opinion about Inventory Plus from DealerSocket (the parent company of IDMS), recommending ReconVelocity based on the software solutions seen so far. Berry referred to himself as "tend[ing] to be very picky when it comes to software solutions." D. Ex. 47.

●When communicating by email Drive Casa's decision not to renew its contract with CarWars, Berry referred to himself as "the executive at Drive Casa that oversees all systems/software as well a[s] IT." D. Ex. 62.

●Concerning establishing the company's Harry Hines office, Berry worked with Torres to plan the desktop needs to support the sales staff.

●It was Berry's responsibility to vet (and then supervise) IT-related vendors, which he did as IT Director.

●On several occasions, Berry and Gallas discussed what Drive Casa's IT looked like at present and what it would look like in the future that would allow Drive Casa to take advantage of automation growth and scalability. When evaluating managed IT services, Berry requested that Torres provide him the Drive Casa plan for the next year, 3 years, and 5 years so that Berry could better gauge what made sense regarding managed services. And

Berry offered to show Torres the assessments and simulated tests Berry had performed over the past year.

To be sure, the trial evidence reflects instances in which Berry engaged in nonexempt work—that is, he performed manual work that did *not* include the exercise of discretion and independent judgment with respect to matters of significance. For example, Berry replaced computers and telephones, and he relocated employee work stations as a countermeasure against the COVID pandemic. According to Berry's testimony, he sometimes devoted substantial hours to such work. But the second and third elements of defendants' affirmative defense are controlled by the employee's *primary* duty, and defendants have met their burden of proof when these elements are evaluated in the relevant *primary* duty context, despite the amount of time that Berry may have devoted to nonexempt work. As the Fifth Circuit has explained:

> an employee's "primary duty" cannot be ascertained by applying a simple "clock" standard that contrasts the amount of time each day an employee spends on exempt and nonexempt work. Section 541.103 of the interpretations defines "primary duty" with respect to all three exemptions. It provides that, while "[i]n the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time[,] time alone . . . is not the sole test." Exempt work may be an employee's primary duty even though such work occupies less than half her time "if the other pertinent factors support such a conclusion." Precisely what those factors are depends upon which exemption is being claimed, but for each the essence of the test is to determine the employee's chief or principal duty. *At least under the short tests, the employee's primary duty will usually be what she does that is of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half*

- 10 -

*her time.*

*Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 (5th Cir. 1990) (emphasis added; footnotes omitted).

Additionally, the evidence reflects that Simbeck identified more than $1.5 million in accrued, unpaid overtime pay due to misclassifying employees.  But at least with respect to Berry, defendants proved that he was an exempt employee who was not entitled to overtime pay.

IV

Although the burden of proving the administrative exemption falls squarely on defendants, it is telling that Berry's conduct is inconsistent with that of an employee who actually believed he was nonexempt and therefore entitled to overtime compensation under the FLSA.  According to the trial evidence, Berry received a year-end bonus of $2,000 for calendar year 2020 that he thought should have been around $20,000.  Within days of receiving the bonus—based on his receipt of about $18,000 less than he expected—Berry requested to speak with Cox, an owner of Drive Casa, to explain why he was upset with the amount.  Yet according to Berry's testimony, during the period of more than one year when he was IT Director, he often worked on average 80 to 90 hours or more per week, i.e., more than double the number necessary to trigger overtime pay.  Despite being short-changed (in his view) each month a staggering amount of unpaid overtime (eventually totaling more than $165,000, by Berry's estimation), there is no evidence that he ever complained about these underpayments until just before—or immediately after—he was given the $2,000 bonus or

- 11 -

was terminated.  In other words, according to the credible trial evidence, after Berry was

promoted from a position in which he was paid overtime to one in which he was not, Berry

remained silent month-after-month for a period of more than one year without ever

complaining (or even asking) about Drive Casa's failure to pay him overtime.  It is simply

not credible that an employee who promptly complained about an $18,000 shortage in an

annual bonus would not complain (or even inquire) over a prolonged period about a much

greater failure to pay overtime compensation if he truly believed he was entitled to overtime

pay.[6]

                                    *    *    *

        Accordingly, for the reasons explained, the court finds and concludes that defendants

have met their burden of proving that the administrative exemption affirmative defense

applies and that Berry is not entitled to recover under the FLSA.[7]

_____

        [6]Although Berry testified that he and Gallas had discussions about his hours and that
he and Torres had discussions about his need for help, Berry did not testify that he ever
complained to anyone about *not being paid overtime*.  In fact, he testified that he did not
believe he brought up the subject of his pay.

        [7]Because defendants have met their burden of proving their affirmative defense, a
potential injustice is avoided in this case.  It is clear from the trial evidence that, beginning
shortly after the onset of the COVID pandemic in March 2020 and throughout the remainder
of the year, Drive Casa implemented a cost reduction plan.  For example, a $450 toner
purchase prompted the company to implement measures for controlling companywide
purchases of toner.  It is also apparent that, had Drive Casa management been aware that
Berry was claiming entitlement to staggering amounts of overtime pay—which for many
weeks in 2020 averaged more than twice the 40-hour per week threshold—Drive Casa would
immediately have put a stop to, or at least significantly restricted, his overtime work.  In fact,
Drive Casa placed limits on Berry's overtime when he worked for Simbeck in the Finance
Department.  It is reasonable to infer from the trial evidence that Drive Casa would not have
allowed Berry to accrue more than $165,000 in overtime, on the one hand, while

April 21, 2022.

_____
SIDNEY A. FITZWATER
SENIOR JUDGE

---

implementing companywide cost-cutting measures involving much smaller expenses, on the
other. A ruling in Berry's favor would enable him to recover compensation, and perhaps
liquidated damages and attorney's fees, based on overtime that it can reasonably be inferred
from the trial evidence Drive Casa would never have allowed him to work. In the final
analysis, this potential injustice is avoided because defendants have proved their affirmative
defense.